Busch Jewelry Co., Inc., and Others, Plaintiffs, *v*. United Retail Employees' Union, Local 830, and Others, Defendants.

In the Matter of Tony Bajor, J. Williams, Harry Etsig, Samuel Weisbard and Ben L. Berman, Defendants.

Supreme Court, Special Term, New York County, October 20, 1938.

*Scandrett, Tuttle & Chalaire* [*Bernard Philips* of counsel], for the plaintiffs.

*Harold Dublirer,* 'for the defendants Tony Bajor and others.

Cotillo, J.   The task I now have to perform is a very distasteful one.   However, an American jury of men and women drawn from a true cross-section of the people of this city have sat in judgment and have listened to all the testimony and have rendered their unanimous verdict holding these defendants guilty of criminal contempt.

The judicial system of our country brought to us by our ancestors has always guaranteed to any accused liable to incarceration a trial by a jury composed of his peers.   Prior to September 1, 1935, all motions to punish a person for contempt of court order were tried by the court alone.   But the Legislature in its wisdom, in order to give labor additional protection and to further safeguard the rights of labor, enacted in the year 1935 section 882-a of the Civil Practice Act, which states as follows: " No person shall be punished either by fine or imprisonment for any alleged contempt arising out of any failure or refusal to obey any mandate of the court   *   *   * in any case involving or growing out of a labor dispute — except after a trial by jury to which the defendant shall be entitled as a matter of right."

Pursuant to that lawful mandate ·of the Legislature, the court submitted to a jury the precise question that was involved in this proceeding, and the precise question was, *whether by a course of conduct, commonly known as picketing, Local 144, known as Window Trimmers' Union, and the five defendants on trial have aided and abetted others in violating an injunction order that was issued out of this court on June 28, 1938.*

All of you are guilty of picketing.   The defendant Ben L. Berman is the business agent of the defendant Local 144.   All stand in the category of convicted defendants who, after a jury trial, have been

declared guilty of subversive practices, prohibited by law, illegal in character, and based upon a collusive and illegal scheme to circumvent the mandate of this court.

I may say at this time and place that this predicament in which you find yourselves arose from a decree issued by this court on June 28, 1938. At that time it was your affiliate C. I. O. Locals 830 and 208 which were on trial, and also their business agent. At that time, June 28, 1938, the practices testified to and proved by oral testimony in open court, established that the pickets and the defendant unions effected what might even be called a policy of near-terrorism, by ganging up on the employer. They had misused the mails to send inflammatory literature to residents in apartment houses occupied by Busch workers. There were acts of assault and of brutality. There was the use of slanderous names bearing down upon the womanhood of America, and an interference with peace and order so as to induce to the fear of riot and public violence as well.

Race riots were invited by having colored strikers grab and threaten white girls at the stores located in predominantly white sections of the city, while in Harlem, where the colored people are in the majority, appeals were made to the colored people which were highly inflammatory. This city has known no lynching since the days of the Civil war when colored people were hanged in the streets of this city during the draft riots, but the action of the colored strikers in midtown New York and in the Harlem district were such that if committed elsewhere a lynching bee might well have resulted. Some of the strikers took advantage of the strike to attempt to ween customers of Busch's away and steer them to relatives of the strikers in the same line of business. Others informed customers who owed Busch money that there was no necessity to make payments, and that collections would be prevented. One of the strikers continued to make collections and to pocket them. Girl employees of Busch who failed to see eye to eye with the strikers were insulted in public by being called such names as " whore " and " lice."

Mass demonstrations were staged on the public streets and some of the strikers endowed with talent put on what is known as shag dancing on the public streets in order to collect crowds and stop ingress and egress to the stores. Police protection seemed futile and even non-existent; and disorder was rampant. Girl employees not on strike were molested and assaulted.

The union officials not only condoned this conduct but encouraged it. Their strike bulletins issued from union headquarters not only praised certain strikers for their outrageous actions but advised others to copy them and even increase the violence.

During the trial of that action, in an endeavor to aid the labor cause, the court called several adjournments for the purpose of finding a solution of the problem, but met with no success.

The business agents of the union soon displayed their fangs and refused any compromise. Following the methods of the Orient they must rule or ruin in order to save their faces. This is not my classification, but the actual words of the business agents in answer to all pleas for compromise.

When I offered them a compromise permitting two pickets in front of each store instead of mass picketing, their one answer was a surly " no, we must save our faces." It was declared that it was necessary to meet judicial defiance with labor defiance. At this point even the fact that the court availed itself of the services of distinguished counsel representing the C. I. O. to aid its proposed settlement proved unavailing. The spirit of compromise was wholly absent.

Labor, in my estimation, does not exist solely for the benefit of business agents or organizers who draw large salaries. Labor has not struggled and fought the good fight since the old padrone system, merely to enrich and place in soft jobs and position of power certain types of labor organizers and business agents.

When I sat in the Legislature I voted for an amendment to the Donnelly Conspiracy Act exempting labor from the provisions of that act and declaring that " labor is not a commodity." Not only is labor not to be deemed a commodity to be exploited by greedy capitalists, but the same principle must be invoked to protect it from parasites that fatten upon the fruits of the laborers' sweat and blood in the form of certain unscrupulous racketeering business agents and organizers whose sole thought is their own welfare.

Illegal picketing after a liberal and fair trial was permanently enjoined by a decree of this court on June 28, 1938. That injunction not only directed that all picketing cease so far as persons in the employ of the plaintiff were concerned, but *it forbade each and every other person, including those not directly involved, from aiding or abetting or entering upon any plan or scheme by which the Busch stores would suffer from picketing.*

It is for a violation of that injunction order and for aiding and abetting that you stand convicted before me. For everybody's peace of mind, it is to be stated that such conviction came after a trial before a jury of twelve men and women, in accordance with the provisions of the Civil Practice Act in effect since 1935.

I have endeavored to afford you and your counsel every latitude. I have been liberal and let in evidence on your behalf, based upon hearsay perhaps, and even relented so far as to compel you to

show your minute books to the plaintiff. My charge to the jury concerning the facts of this case gave you the benefit of every reasonable inference. Thus you have had a fair trial under as favorable a set of circumstances as it is legally possible to have, and the jury has found you guilty of a criminal contempt.

Before this jury, the picketing upon which you have been found guilty establishes that you continued to picket with knowledge of the outstanding order and in open defiance of that order.

The picketing complained about was done by professional pickets paid to picket for hire; by persons not connected with Window Trimmers' Local 144.

The testimony showed strong convincing proof that the primary purpose of the picketing by your Local 144 was to circumvent the injunction order one day after its issuance. The plan was to reach out after Busch and no other jeweler or jewelry store. The evidence clearly shows that window dressers are not employed in any jewelry store, but that their activities have been confined to shoe and textile stores where the goods handled are of a gross character, and never applied to such commodities as jewelry. Jewelry always has been handled by bonded salespeople. Though there are three hundred jewelry stores in the city of New York, only the Busch stores were affected by your picketing.

Testimony was further adduced that a meeting of Local 144, had been called an evening or so previous to the picketing and it was decided to go after Busch.

When this trial commenced plaintiff's counsel subpœnaed the books and records of Local 144. Despite the fact that the officers of that local claimed that they had a legitimate dispute and despite the fact that they professed their union to be an independent, autonomous and legitimate union, they absolutely refused to permit counsel for complainants any opportunity to see any of the minutes of any of their meetings. They are alleged to have had various meetings during the months of June, July, August and September, and yet when asked to produce a single notice sent out to the membership the answer was the union had not retained in its files any copies of such notices. Not a single set of minutes that would tend to corroborate defendants' claim that the picketing was in furtherance of a genuine labor dispute was submitted. Despite the fact that Ben L. Berman, business agent of Local 144, testified that he had been authorized by the executive council of the union on August 12, 1938, to have pickets appear in front of the Busch stores, defendants' counsel refused to permit the minutes of that meeting to be examined by complainants' counsel.

On July 7, 1938, defendant Berman admitted that he attended a meeting of representatives of the New York city locals of the

United Retail and Wholesale Employees of America, the same parent organization to which both Local 144 and Retail Employees Union, Local 830, are affiliated. At that meeting, these various locals pledged financial assistance and voted " to have picket committees for each local join the strikers in advertising their fight with Busch throughout the city."

On August 3, 1938, and on August 10, 1938, Local 144 addressed letters to the Busch Company in which they announced their intention to unionize window trimmers in plaintiffs' stores. This sudden activity directed against the Busch Jewelry Company the jury has found was motivated by considerations other than an effort to better the conditions of any group of employees, for Berman admitted on the witness stand that he first conceived the notion of directing his attention toward jewelry stores immediately after this court issued its injunction against all picketing in front of the Busch Jewelry Company stores. The testimony further showed that not a single jewelry company in the city of New York employs a single window trimmer. Defendant Berman could not give the name of a single member of Local 144 employed to do any window trimming in any jewelry store in the city of New York. He further admitted that he had not sought to unionize a single employee of the Busch stores, and that the only jewelry company being picketed was the Busch Company. Testimony of plaintiffs' employees and that of Mr. Wagner, executive secretary of the Credit Jewelers Association, demonstrated that the company had permanent platforms set in windows of its various stores; that each morning a bonded salesman would place the watches, rings and other valuable merchandise in designated positions on these platforms and remove them in the evening; that this job took from twenty minutes to approximately one-half hour.

Testimony further showed that at one time for a period of three or four days pickets from Local 144 and Locals 830 and 208 were picketing alternately. What inference would the ordinary reasonable man draw from such conduct?

Not every court faces such a situation as is here before me. This is the first time, so far as I know, that an affiliated local belonging to the same parent body has been found guilty of a criminal contempt. What is involved here is not a similar question to that which concerns the trial of fourteen pickets who, connected with Locals 830 and 208, are to be tried for unlawful picketing next Monday, October twenty-fourth.

Here is a new and separate phase of unlawful picketing. The acts here are based on a conspiracy or fraudulent plan to circumvent a lawful mandate of this court.

The evidence shows that at a July 7, 1938, meeting, twenty-three locals affiliated with C. I. O. met and discussed the June twenty-eighth injunction against Busch. At that meeting funds were subscribed, volunteer pickets were offered, and arrangements made to set up a faked labor dispute between this employer and Local 144 made up of window trimmers, and which local may be characterized as of mushroom growth.

In other words, the jury found the absence of any real labor dispute existing between Local 144 and Busch. It also found that the conduct complained of was unlawful and that all the acts of these defendants were aimed at helping, aiding and abetting two sister locals, namely, 830 and 208, already enjoined by this court on June 28, 1938.

It is common knowledge that the C. I. O. parent body of the several affiliated locals concerned here has introduced new methods of settling current labor disputes such as sitdown strikes and mass picketing.

Failing by these unorthodox methods, thereafter at the mass meeting held at the Center Hotel in New York city, attended by twenty-three locals affiliated with C. I. O., there was originated a further new method, as followed out in this case. That method consisted of having one of their local unions, No. 144, not a party to the original controversy between Busch and Locals 208 and 830, and having no prior business dealings with the plaintiffs and acting under the guise of a faked labor dispute, as the jury has found, violate the injunction of this court by throwing out a picket line in front of the several Busch stores.

In a labor dispute one finds two sides to a controversy, each zealously and fervently fighting a crusade for right and victory. Here there is only one side and an interloper, Local 144 with its professional pickets. The intruders are you five convicted men, who singly and in concert have deliberately injected yourselves into this dispute. For what? Are you employed by Busch? No! Are you seeking higher wages? No! Or shorter working hours? No! Or collective bargaining? No! Are you members of 144 even? No! You are violating a court order because of a supreme desire to vengefully secure satisfaction by defying this court. Labor does not win its spurs or battles by such efforts. You are less concerned with wages, hours of work, the betterment of the working class, than with getting around a court order. Even if what is involved is not a conspiracy, surely the jury's verdict finds a collusive scheme to frame an imaginary labor dispute so that the public might know that Busch and labor are still at war.

If a separate and genuine dispute had existed here, you would not have been found guilty. There is no such labor dispute in

being. Only a plan or device fraudulently conceived by some of your organizers to delude the public mind that Busch had not won; that labor had not lost; that the fight between capital and labor in this dispute was still to be decided; that the malpractices found illegal in June, 1938, were of no consequences, else the public would not be witnessing the present picketing. Such in effect are the legitimate conclusions from the acts which the jury has found and condemned by their verdict.

A professional picket or paid worker as the evidence disclosed in this case has no direct bearing in a labor controversy in which he is participating. You men are not even window dressers. Yet your conduct sought to enlist public sympathy for a cause for which you received pay. You were simply let out for hire. I do not say that this is the ultimate test of your right to picket, but it is especially condemnatory when coupled with a scheme like yours was, to determine for yourselves and arrogate unto yourselves, the right to say that the June, 1938, order of this court could be disregarded with impunity.

In this day and age it is impossible to write down by word or statute what may be done or what may not be done in labor disputes. The field of human relations is too liquid and full of changes to admit insuring complete satisfaction by promulgating stereotyped expressions of rules. Thus all the law on our statute books, the decisions in the law reports, and the rules emanating from within our legal forum in the final analysis are but moulds within which framework decisions are to be supplied. Under one set of facts a course of conduct is marked illegal and improper; under another it is sanctioned by usage, social acceptance or a public readiness to acquiesce.

Here the distinction arises between the right of each and every labor local to picket in each and every genuine labor dispute existing between it and the employer on the one hand, and the larger objective of having the public informed of the existence of a labor dispute, of one kind or another, in the face of a restraining order.

It is in the face of the ready opportunity for abuse of the great privilege granted to labor, to maintain unimpaired and in full vigor the right to picket, that there arises the ready opportunity for the springing out of the abuses alleged to have been committed here.

I am compelled to set down in sentencing you, certain reflections bearing directly on this newer phase of the Busch problem. I am more than ever convinced that in the current expansions of labor unions, their rapid growth has led to unintentional and perhaps unhappy extremes. Labor's best friends admit this. Labor's

sincerest leaders concede it. The tolerant public accepts it as a fact. But if every one concerned rested there, I, together with others, would feel unhappy. It is because all three, the public-spirited citizen, the intelligent and understanding labor leader, and the understanding capitalist, make allowances for excesses arising from the sudden draft of new power given to labor which gives hope for the future.

When abuses occur, public sentiment is aroused. Only by employing sound tactics can labor create for itself a friendly public support. Internal warfare estranges the public, just like collusive labor disputes and sympathetic strikes, when drawn too far afield, cause a change of the public mind.

I note that in the State of California, a public law is to be voted upon which would outlaw sit-down strikes and severely restrict picketing and boycotting.

The proposed California State law would prohibit all picketing where no strike exists, all picketing of homes, all mass picketing, all picketing of customers, clients, advertisers or supply houses of a struck employer, and all picketing by " mercenaries " or others not employed by the struck employer. You men were found guilty of just such practices.

Most of us recall the days when in the early state of our industrial development a one-way capitalistic system exploited the worker. It ground down both women and children and made of men little more than slaves. It paid paltry wages and maintained sweat shops. It sanctioned padrone systems. It cared less for human beings than it did for stock dividends. It sowed the dragon's teeth out of which come future revolt.

Those excesses, foistered by a greedy capitalism, upon an indifferent public in the past, are gone from us forever. None of us would have their return at any price. Progress means the permanent abolition of such abuses against the working class, and an elimination of the past disregard for the welfare of the general public. But are we witnessing a duplication of such excesses? Does labor blindly seek to follow in the footsteps of such an unfriendly and an unforeseeing public policy? Should not labor make its gains by insuring to itself public support through an avoidance of practices which create suspicion that collusive labor disputes are created for the sole purpose of harassing an obstinate employer? Far more would it help labor to avoid the rise of such suspicions than to lose a bushel of lawsuits.

The Federal Constitution and many State Constitutions indeed have implanted permanently protective safeguards from which stand labor must continue to move forward. Rescession is unthinkable but unfair practices in labor warfare will poison the springs

of public friendliness as inevitably as was the good will of the public estranged through earlier capitalistic ignorance. That past ignorance brought us today the current Federal investigation of monopolistic practices.

Reverting a moment to England's experience, we find that neither participant in industrial relations welcomes the intervention of the arm of the government in unrestricted fashion.

The English Trade Disputes Act, 1906 (6 Edw. 7, c. 47) does not make compulsory the incorporation of unions, nor does it bring in being the degree of coercion ordinarily ascribed to it. From our own investigations of that act, and speaking from a standpoint friendly to labor, it is the settled conviction of students of this problem, lawyers as well as social economists, that labor stands to gain more by entering into voluntary agreement with capital, than its gains can ever be by being compelled to take what the government may decide to give. The heads of both the main labor organizations in America are beginning to realize this.

Out of these American experiences grew the federation plan of unionism which gave labor its greatest strength. It came with the organization of Knights of Labor in 1869. The loss through violence of the great strikes of 1886 hurt labor organizations. But out of this grew the American Federation of Labor, and in our own day we have witnessed its great rival, the militant C. I. O.

No one is more anxious than I am to see labor receive its just due. My legislative record of ten years at Albany, I believe, shows a deep and abiding faith in the rank and file which make up the labor class.

I am satisfied that the interests of the average working man can be better protected than it has been at times. This case is an illustration of the abuses of confidence imposed by the worker class upon the particular leaders involved here.

As a matter of fact, I could almost make up a list of ten commandments, so to speak, useful for some labor leaders to keep in mind and fruitful of good to the ordinary worker.

The facts in this case lead me to believe that it is less important to start up mushroom locals such as this was, than it is to slowly build upon existing needs along activities which are realistic and not feigned. Faking a labor dispute, which is the jury's finding in this case, has not helped labor.

The evidence here showed little need of any window trimmers in the jewelry trade. Let labor which seeks to arouse public support for its cause stop jurisdictional disputes, wherever possible settle internal disputes amicably; avoid the levy of excess assessments upon members; account for the dues it receives; regulate

its picketing activities within the bounds of reason; incorporate, as was suggested by the illustrious Justice BRANDEIS twenty-five years ago, and permit public access to its books.

These are the objectives which will aid labor with the public. No one wants to see the day, labor least of all, when important court decisions are made the occasion for criticizing our courts and judges. Would labor have the reputation that it seeks legal decisions on the basis of expediency? Must the judge hesitate before deciding a case and determine beforehand if his opinion would please a powerful political entity? Expediency is never justice. Yet certain unscrupulous labor leaders have sought to make political capital out of such an un-American attitude and have not stopped even at villification bordering on criminal libel.

The jury's verdict under the facts testified to in this case will neither make nor break the cause of labor. If what is before me had been a genuine labor dispute, the court would have been more than happy to make a finding protective of the interests involved. But, on the other hand, as has been testified to, there exists a nefarious scheme to intimidate the employer, and such improper practices deserve the condemnation of this court.

The essence of the conduct complained about in this proceeding is conduct not only calculated to impair, impede and materially affect the welfare and property both of the petitioner, but it is a course of conduct seeking to induce others to break our law. It has always been a matter of misconduct to induce another to do what the law forbids. The law with respect to forbidding conspiracies or a course of conduct violative of order is not rigidly stated. No set of facts can be prescribed beforehand. The merit or demerit of the conduct in each case must be measured under its own set of facts.

These general observations are in keeping with the importance of this case. You five defendants have been convicted by an alert and intelligent jury which performed a civic duty. Every constitutional right of yours has been safeguarded by your able counsel and the judicial system here. I know of no other country where such latitude and safeguards are provided the accused.

Now, therefore, bearing in mind the duty before me of protecting the public from the illegality which you practiced, I am sentencing the business agent Ben L. Berman to thirty days' imprisonment in the county jail and to a fine of $250; I sentence each picket to ten days in jail and $100 fine each, excepting that the jail sentence of Harry Etsig is reduced to five days, and $100 fine, solely because of his advanced age.